IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNIVERSITY OF KANSAS HOSPITAL AUTHORITY )
4000 Cambridge Street )
Kansas City, KS 66160 )
)
MIAMI COUNTY MEDICAL CENTER, INC. )
20333 West 151 St Street )
Olathe, KS 66061 )
)
OLATHE MEDICAL CENTER, INC. )
20333 West 151 St Street )
Olathe, KS 66061 )
) Case No. 1:26-cv-976
UKHS GREAT BEND, LLC )
2330 Shawnee Mission Parkway )
Suite 312 )
Westwood, KS 66205 )
)
NEW LIBERTY HOSPITAL CORPORATION )
2525 Glenn Hendren Drive )
Liberty, MO 64068-9625 )
)
                        *Plaintiffs* )
)
            v. )
)
ROBERT F. KENNEDY, JR. in his official capacity as )
Secretary of Health and Human Services, )
200 Independence Avenue, SW )
Washington, DC 20201, )
)
                        *Defendant*. )
_____ )

## **COMPLAINT**

Plaintiff hospitals bring this Complaint against Defendant Robert F. Kennedy, Jr., in his

official capacity as the Secretary (the "Secretary") of the Department of Health and Human

Services ("HHS"), and allege as follows:

**NATURE OF THE ACTION**

1.       For nearly forty years, HHS has ignored the Medicare statute and unlawfully cut Medicare payment rates to hospitals by nearly six percent, denying hospitals billions of dollars in payment for their services.  This agency-imposed discount comes as the result of a payment error made in 1986 which HHS has steadfastly refused to correct.  When hospitals first brought this error to HHS's attention in comments to the 1986 rulemaking, HHS used a tortured reading of the Medicare statute to defend itself.  That reading flew in the face of the plain meaning of the statute and has since been soundly rejected.  *St. Mary's Reg'l Med. Ctr. v. Becerra*, No. 1:23-CV-1594-RCL, 2024 WL 5186641 (D.D.C. Dec. 20, 2024).  Five years after it was brought to HHS's attention, HHS itself suggested that the statute did not authorize this payment reduction—but again did nothing to fix it.  56 Fed. Reg. 43,358, 43,418 (Aug. 30, 1991).  When hospitals once again asked HHS to fix its error beginning with Fiscal Year ("FY") 2026 payment rates, HHS simply ignored those comments and continued to impose the unlawful rate cut.  And, when Plaintiff hospitals initiated this challenge seeking to have their payment rates corrected, HHS's administrative tribunal deflected once again claiming that the Medicare statute shielded HHS's alleged errors from review altogether, but this interpretation was squarely rejected by this Court in *St. Mary's* as well.  *St. Mary's*, 2024 WL 5186641, at *9.  In short, HHS's actions violate the plain language of the Medicare statute, which does not strip this Court of jurisdiction to hear Plaintiff hospitals' claim.

2.       Plaintiff hospitals therefore seek an order from this Court reversing HHS's payment error and directing it to restore the almost six-percent reduction to their Medicare payment rates.

3.       HHS first imposed this unlawful payment reduction in 1986, shortly after Congress overhauled how the Medicare program pays hospitals for the inpatient care they provide to

Medicare beneficiaries.  When Medicare was first enacted in 1965, it reimbursed hospitals for the "reasonable cost[s]" they incurred to provide care.  *See* 42 U.S.C. § 1395f(b)(1).  Hoping to incentivize hospitals to provide care more efficiently, Congress scrapped the reasonable cost system in favor of an "inpatient prospective payment system" ("IPPS") that assigns fixed payment rates for each inpatient service a hospital provides to a Medicare inpatient.  42 U.S.C. § 1395ww(d).  To mitigate any disruptive payment swings, Congress required the transition to IPPS to be budget neutral—aggregate Medicare payments in FYs 1984 and 1985 were to be no more or no less under the IPPS than what they would have been under the old reasonable cost payment system.  42 U.S.C. § 1395ww(d)(2)(F), (e)(1)(B).

4.      The formula for this budget neutrality adjustment is set forth in the Medicare statute, and the statute is explicit that the adjustment applies only in 1984 and 1985—no budget neutrality adjustment should be made in FY 1986 or any year thereafter.  Instead, IPPS rates were to be determined in FY 1986 and later without regard to what payments would have been under the old reasonable cost system.

5.      In 1984 and 1985, HHS projected that total Medicare payments under the new IPPS would exceed what the program would have paid under the reasonable cost system in those years.  In 1984, HHS reduced IPPS payment rates by three percent to ensure budget neutrality.  49 Fed. Reg. 234, 334 (Jan. 3, 1984).  In 1985, HHS projected that total IPPS payments would exceed expenditures under the reasonable cost system by 5.59 percent and reduced FY 1985 IPPS payment rates by that amount.  49 Fed. Reg. 34,728, 34,793–96 (Aug. 31, 1984).

6.      Plaintiff Hospitals do not dispute HHS's 1985 calculations.  Instead, the error the Hospitals are appealing starts with FY 1986, the year in which Congress instructed HHS to retire the FY 1985 budget neutrality adjustment.  42 U.S.C. § 1395ww(d)(3)(A)(i); *see also id*.

3

§ 1395ww(e)(1)(B) (noting that the budget neutrality adjustments would apply only "for discharges occurring in fiscal year 1984 or fiscal year 1985").  Despite clear statutory instructions, HHS continued to apply the FY 1985 budget neutrality adjustment beginning in FY 1986, reasoning only that "the Act does not explicitly require" HHS to make IPPS payments without it.  50 Fed. Reg. 35,646, 35,697 (Sept. 3, 1985).  This reasoning is wrong.  As a judge of this Court recently observed, "[t]he statute simply supplies no basis for carrying forward the budget-neutralized standardized amounts from 1985 to 1986; to the contrary, it forbade the Secretary from doing so." *St. Mary's*, 2024 WL 5186641, at *10.  The Secretary's unlawful budget neutrality adjustment has remained baked into payment rates for every subsequent fiscal year, including the present FY 2026.  In this way, HHS has granted itself an unauthorized, nearly six percent discount for forty years, and received a multibillion-dollar windfall at the expense of the nation's hospitals who have faithfully treated Medicare beneficiaries.

7.    Plaintiffs have asked HHS to end the unauthorized discount moving forward.  But HHS ignored Plaintiff hospitals' request to remove the budget neutrality adjustment beginning with FY 2026 IPPS rates and restore the 5.59 percent reduction.  When HHS ignored those comments and included the adjustment yet again, the Plaintiff hospitals initiated this challenge before HHS's Provider Reimbursement Review Board ("PRRB" or "Board"), the tribunal within HHS that hears Medicare IPPS challenges.  The Plaintiffs requested that the Board grant expedited judicial review ("EJR") of their appeals because even though the Board has jurisdiction over their claims, it does not have authority to order the Secretary to reverse is 5.59 percent reduction.  The Board granted the Plaintiffs' requested for EJR.  Having exhausted their administrative remedies, the Plaintiffs now bring this action under 42 U.S.C. § 1395oo(f)(1).

8.     HHS's reading of the statute is incorrect all around and its decision to apply the 1985 budget neutrality adjustment in the current fiscal year is unlawful.  For the reasons set forth below, the Plaintiff hospitals respectfully request that this Court order HHS to restore the 5.59 percent rate cut that it has unlawfully applied to IPPS rates.

## JURISDICTION AND VENUE

9.     This action arises under the Medicare Statute, title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

10.     Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(ii), 1395oo(f)(1), 28 U.S.C. §§ 1331 and 1361.

11.     Venue is proper in this judicial district in accordance with 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

## PARTIES

1.     The Plaintiff hospitals in this action are five (5) hospitals that participate in the Medicare program, are reimbursed under the IPPS, and are paid according to the standardized amounts published by HHS in annual IPPS rulemakings.   The Plaintiff hospitals are listed below with their Medicare Provider Numbers:

    (a)     University of Kansas Hospital Authority, Medicare Provider No. 17-0040;

    (b)     Miami County Medical Center, Inc., Medicare Provider No. 17-0109;

    (c)     Olathe Medical Center, Inc., Medicare Provider No. 17-0049; and

    (d)     UKHS Great Bend, LLC, Medicare Provider No. 17-0191; and

    (e)     New Liberty Hospital Corporation, Medicare Provider No. 26-0177.

2. The Defendant, Robert F. Kennedy, Jr. is the Secretary of HHS, which administers the Medicare and Medicaid programs established under titles XVIII and XIX of the Social Security Act. Defendant Secretary is sued in his official capacity only. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## LEGAL BACKGROUND

### A. Medicare Part A Payments

3. The Medicare program provides federally funded health insurance for certain elderly and disabled persons under title XVIII of the Social Security Act. 42 U.S.C. § 1395 *et seq*. This dispute concerns Medicare Part A, which covers inpatient hospital and certain other institutional services. 42 U.S.C. § 1395d(a)(1)

4. Originally, Medicare reimbursed hospitals for the actual costs they incurred providing inpatient care to Medicare beneficiaries. *See* 42 U.S.C. § 1395f(b)(1). Congress determined, however, that reimbursing hospitals on a cost basis did not sufficiently incentivize hospitals to be efficient in providing care. To address this concern, Congress transformed Medicare's payment scheme for hospitals by instituting a prospective payment system for inpatient hospital services, known as the IPPS, effective for cost reporting periods beginning on or after October 1, 1983. Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149–163 (codified at 42 U.S.C. § 1395ww(d)). Under IPPS, hospitals receive a prospectively determined fixed payment for each patient they treat and subsequently discharge.

5.      The Medicare statute prescribes a specific methodology for calculating IPPS payments.  At its most basic level, an IPPS payment is the product of a uniform base payment amount—known as the "standardized amount"—that is adjusted for each inpatient case based on the severity of the patient's specific diagnosis.  42 U.S.C. § 1395ww(d)(1)–(2).  Each diagnosis is captured in a "diagnosis-related group" or "DRG."  High-cost admissions like heart transplants receive higher DRG weights, while less costly inpatient admissions are assigned to lower-weight DRGs.  But in either case, the DRG amount for any given admission is multiplied by the same standardized amount base payment to arrive at the specific payment for that inpatient admission. This case centers on how HHS calculated the standardized amount in the early years of the IPPS.

6.      Before each fiscal year, HHS publishes in the Federal Register the standardized amount it will apply to all inpatient services.  42 U.S.C. § 1395ww(e)(4)–(5).  But when it does so, HHS does not recalculate the standardized amount from scratch each year.  "Instead, following Congress's directive, [HHS] calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation."  *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).  That base year was FY 1984.  42 U.S.C. § 1395ww(d).

**B.  Statutory Steps for Calculating the Inaugural Standardized Amount**

7.      Congress prescribed specific steps for calculating the first standardized amount in FY 1984.  First, the statute required HHS to determine "the allowable operating costs per discharge of inpatient hospital services for [each] hospital for the most recent cost reporting period for which data are available."  42 U.S.C. § 1395ww(d)(2)(A).  HHS tabulated the cost of all hospital inpatient services and divided them by the total number of hospital inpatient discharges to arrive at a "cost per discharge" amount.  (HHS failed to distinguish between patients that were *transferred* from one hospital to another from patients that were actually *discharged*; that error is the subject of the *St.*

*Mary's* litigation as discussed below.)  HHS used cost and discharge data from FY 1981 (the most recent available at that time) and updated that cost per discharge amount by inflation to arrive at a cost per discharge amount for FY 1984.  42 U.S.C. § 1395ww(d)(2)(A)–(D).

8.    Next, HHS was required to smooth out or "standardize" the cost per discharge amount to account for characteristics that might artificially inflate or deflate a particular hospital's costs and skew the overall data.  These characteristics include disparities from hospital to hospital in labor costs or patient acuity, as well as the increased costs that some hospitals incur to operate medical education programs.  42 U.S.C. § 1395ww(d)(2)(C).

9.    Following standardization, the statute required HHS to separately calculate an average standardized amount for urban hospitals and an average standardized amount for rural hospitals.  42 U.S.C. § 1395ww(d)(2)(D).  Urban and rural hospitals can receive an additional payment, known as an "outlier" payment, when treatment of a patient significantly exceeds the anticipated cost for the patient's diagnosis.  Both the urban and rural average standardized amounts were reduced to offset HHS's estimate of outlier payments that year.  42 U.S.C. § 1395ww(d)(2)(E).

10.    Congress included one additional step for calculating the standardized amount for FY 1984 (and also for FY 1985).  The statute required HHS to further adjust the average standardized amounts so that aggregate IPPS payments in FY 1984 would be no more or less than what they would have been under the reasonable cost system.  *See* 42 U.S.C. § 1395ww(d)(2)(F), (e)(1)(B).  This is known as the budget neutrality adjustment which is referenced above.

11.    Specifically, section 1395ww(d)(2)(F) instructed HHS to adjust the standardized amount "as may be required under subsection (e)(1)(B)."  Section 1395ww(e)(1)(B), in turn, reads in relevant part as follows:

> For *discharges occurring in fiscal year 1984 or fiscal year 1985*, the Secretary shall provide under subsections (d)(2)(F) and (d)(3)(C) for such equal proportional

adjustment in each of the average standardized amounts otherwise computed for that fiscal year as may be necessary to assure that—

    (i)    the aggregate payment amounts otherwise provided under [IPPS] *for that fiscal year* for operating costs of inpatient hospital services of hospitals,

are not greater or less than—

    (ii)    … the payment amounts which would have been payable for such services for those same hospitals *for that fiscal year* under this section under the law as in effect before April 20, 1983.

42 U.S.C. § 1395ww(e)(1)(B) (emphasis added).

12.    HHS projected that Medicare would pay more for inpatient hospital services in FY 1984 under the IPPS than what Medicare would have otherwise paid had the reasonable cost system remained in place. 49 Fed. Reg. at 332–34.  To offset this projected budgetary impact, HHS adjusted the FY 1984 standardized amount by a factor of 0.97, which translated to a three percent decrease in overall payments. *Id.* at 334.

**C.  Statutory Steps for Calculating the FY 1985 Standardized Amount**

13.    Congress required HHS to follow the same multistep methodology again in FY 1985.  Section 1395ww(d)(3)(A) (hereafter "Subparagraph A") contains specific instructions for "[u]pdating [the] previous standardized amount[]" from FY 1984 to FY 1985.  Subparagraph A specifies that the starting point for updating the FY 1985 standardized amount is the "average standardized amount computed for the previous fiscal year [FY 1984] under paragraph (2)(D)" updated for inflation.  The "standardized amount under paragraph (2)(D)" was the FY 1984 base rate *after* it was adjusted for inflation but *before* it was further adjusted under section 1395ww(d)(2)(E) for outliers and under sections 1395ww(d)(2)(F) and (e)(1)(B) to maintain budget neutrality between the IPPS and reasonable cost systems.

9

14.    The statute required HHS to take the inflation-adjusted base rate and apply entirely new adjustments for outliers and budget neutrality specific to FY 1985.  First, section 1395ww(d)(3)(B) directed HHS to calculate a new adjustment to offset projected outlier payments in FY 1985.  Second, section 1395ww(d)(3)(C)(i) tasked HHS with calculating a new adjustment under section 1395ww(e)(1) to ensure IPPS payments in FY 1985 were no more or less than they would have been under the reasonable cost system.  "For discharges occurring in fiscal year 1985, the Secretary shall adjust each of such average standardized amounts as may be required under subsection (e)(1)(B) for that fiscal year."  42 U.S.C. § 1395ww(d)(3)(C)(i).

15.    HHS again predicted, as it did in FY 1984, that aggregate Medicare expenditures for inpatient hospital services in FY 1985 would be greater under IPPS than they would have been under the reasonable cost system and proposed a reduction in total IPPS payments to maintain budget neutrality.  49 Fed. Reg. at 34,793–96.

16.    However, HHS applied the budget neutrality adjustment differently in FY 1985 than it did in FY 1984.  Like in FY 1984, HHS again applied a reduction factor to the FY 1985 standardized amount, this time applying a factor of 0.954.  *Id.* at 34,796.  But unlike in FY 1984, HHS also reduced the *DRG weights* for FY 1985 by 1.05 percent. The combined effect of these adjustments was a reduction in overall IPPS payments of 5.59 percent in FY 1985.[1]

17.    HHS's rationale for applying part of the adjustment required by sections 1395ww(d)(3)(C)(i) and (e)(1)(B) to the DRG weights is technical but ultimately not rooted in the statutory text.  Rather, HHS determined that this approach "is more equitable since it distributes the burdens of the adjustments more equitably and provides a more even cash flow for all hospitals"

---

[1] $\{1- [0.954 \times (1 / 1.0105)\} = 5.59$ percent.

but did not cite any provision of the statute that authorizes HHS to apply the adjustment to DRG weights and not solely to the standardized amount.  49 Fed. Reg. at 34,772.

### D.  Errors in HHS's FY 1986 Rate Setting to the Present Day

18.    The statute contains a third methodology for calculating IPPS rates beginning in FY 1986 and into the future.  42 U.S.C. § 1395ww(d)(3).  Subparagraph A instructed HHS to update the standardized amount for FY 1986 starting with the "average standardized amount computed for the previous fiscal year under … this [S]ubparagraph [A]" increased for inflation.  The "standardized amount computed for the previous fiscal year under" Subparagraph A was the 1985 standardized amount *after* it was adjusted by inflation but *before* it was adjusted under section 1395ww(d)(3)(B) for outliers and under sections 1395ww(d)(3)(C) and (e)(1)(B) to render the transition to IPPS budget neutral.  The statute also directed HHS to calculate a new outlier adjustment for FY 1986.

19.    But, unlike in FY 1985, the statute did not authorize HHS to calculate a budget neutrality adjustment to offset the budgetary impact of the transition to IPPS in FY 1986.  Sections 1395ww(d)(2)(F), (d)(3)(C)(i) and (e)(1)(B) only permitted such adjustments "[f]or discharges occurring in fiscal year 1984 or fiscal year 1985."

20.    HHS ignored these explicit limits imposed by the statute.  In calculating the payment rates for FY 1986, HHS updated the *adjusted* standardized amount and reduced DRG weights that it used in FY 1985.  *See* 50 Fed. Reg. at 35,698.  HHS does not dispute that it calculated the 1986 rates in this matter.  When brought to HHS's attention, it offered only a conclusory (and incorrect) explanation that the "budget neutrality-adjusted rates for FY 1985 are … to be used as the basis for the determination of rates for later years."  *Id.* at 35,695.  Rather than rooting its decision in any statutory authorization from Congress—because there is none—HHS only weakly

defended its decision by stating that "the Act does not explicitly require" HHS to drop the budget neutrality adjustments. *Id*. at 35,697.

21.     But even this milquetoast defense is baseless, as HHS itself all but admitted only a few years later.  HHS offered the following comments regarding section 1395ww(e)(1)(B) in a separate rulemaking in 1991:

> [S]ection 1886(e)(1)(B) of the Act required that aggregate payments under the prospective payment system for operating costs for fiscal years 1984 and 1985 equal what they would have been paid under the reasonable cost provisions of prior law. *We doubt anyone would seriously argue that this budget neutrality adjustment should have continued into subsequent years.*

56 Fed. Reg. at 43,418 (emphasis added).  Yet, despite recognizing that no "serious[] argument" can support it, HHS *has* continued the budget neutrality adjustment into subsequent years.

22.     The legislative history of the Social Security Amendments of 1983 confirms the statute's plain meaning and makes clear that Congress did not intend the budget neutrality adjustment required by sections 1395ww(d)(3)(C)(i) and (e)(1)(B) to apply to the standardized amount after FY 1985.  A report by the House Ways and Means Committee describes the process for updating the standardized amount. "[F]or discharges occurring after fiscal year 1984 … [t]he Secretary would take the urban and rural averages for the previous year (*before outlier or budget neutrality adjustments*) and increase them by … an appropriate factor" to account for inflation. H.R. Rep No. 98-25, pt. 1, at 156 (1983) (emphasis added).  The report continues that under section 1395ww(d)(3)(C), HHS "would, *for fiscal year 1985 only*, then make the same type of adjustment … as was made in fiscal year 1984 to assure 'budget neutrality.'" *Id.* (emphasis added). "For fiscal year 1986 and later, the updating process is similar [to FY 1985], *except that there is no step in the computation designed to achieve 'budget neutrality.'*" *Id.* at 134 (emphasis added).

23.    Discussions between legislators and HHS officials at a subsequent hearing before the United States Senate Committee on Finance confirm this understanding.  During the hearing, Senator Max Baucus had the following exchange with Sheila Burke, a representative from HHS:

> Sen. Baucus:  … As I understand it, this proposal is neutral, revenue neutral, in not only 1984 but also, 1985 and 1986.  Is that correct?
>
> Ms. Burke: *Through 1985, Senator, but not 1986.*  It would depend upon what rates were established under the system.  But for fiscal years 1984 and 1985 it is as if [reasonable cost] remained in place.  It saves no more than is saved under that system.

*Social Security Financing Amendments: Hearing Before the S. Comm. on Fin.* 98th Cong. 134 (1983) (emphasis added).

24.    Nonetheless, for forty years since HHS updated the rates for FY 1986, HHS has continued to apply a downward adjustment of 0.954 to the standardized amount and a 1.05 percent reduction to the DRG weights.  These adjustments remain baked into current IPPS payments rates because as HHS has updated those amounts for inflation each year since 1986, it has done so starting from the budget neutralized base rates and DRG weights from 1985—and not based off the *unadjusted* amounts as explicitly instructed by the statute.  A standardized amount and DRG weight understated forty years ago remains understated today.

25.    In the IPPS final rule for FY 2026, i.e., the FY at issue in this Complaint, commenters urged HHS to remove those adjustments so that they do not continue to unlawfully reduce IPPS payments to hospitals in FY 2026 and onward.  In the final rule, HHS ignored these comments and updated IPPS rates solely for the current year inflation factor.

26.    Thus, the FY 2026 rates continue to unlawfully include the 0.954 adjustment to the standardized amount and the 1.05 percent adjustment to the DRG weights from FY 1985.

27.     A judge in this Court recently examined this very provision of the statute in another case and agreed that IPPS rates beginning in FY 1986 and continuing to the current fiscal year should not have included the FY 1985 budget neutrality adjustments. *St. Mary's*, 2024 WL 5186641, at *9 ("[N]o part of the … statute, including the budget neutrality provisions, authorized the Secretary to carry forward the 1985 budget neutrality adjustment to the following year; in fact, the statute forbade him from doing so.").

### E.  The Medicare Appeals Process

28.     The Plaintiff hospitals initiated their challenge to HHS's FY 2026 IPPS rates under section 1878(a) of the Social Security Act, which entitles a Medicare-participating hospital to a hearing before the Board if three prerequisites are met: (i) the provider is dissatisfied with a final determination of the Secretary as to the amount of the payment under the Medicare Act; (ii) the provider files a request for hearing within 180 days of the final determination; and (iii) the amount in controversy is at least $10,000 for an individual appeal or $50,000 for a hospital group appeal. 42 U.S.C. § 1395oo(a)–(b); 42 C.F.R. § 405.1835.  If an appeal satisfies these requirements, the Board has jurisdiction to hear the appeal.

29.     Congress has granted providers the right to appeal two types of "final" Medicare payment determinations.  First, the Medicare program requires hospitals submit a cost report at the end of each fiscal year, which sets forth the amount of Medicare reimbursement claimed by the hospital for the past year.  Those costs reports are reviewed by HHS's fiscal intermediaries who, following their review, issue a "final payment determination."  Providers have a right to a hearing over this type of final payment determination.  42 U.S.C. § 1395oo(a)(1)(A)(i).

30.     After Congress adopted the IPPS, Congress granted Medicare hospitals the right to appeal from another "final" payment determination that was not connected with the filing of a

year-end cost report. Because the IPPS system sets prospectively determined rates at the beginning of each fiscal year, which hospitals must use for budgetary reasons, Congress recognized that HHS may make errors in determining those rates and that it would be unfair to require hospitals to wait several years until the resolution of their cost reports before seeking administrative and judicial review. Therefore, Congress amended the Social Security Act to give the Board jurisdiction over appeals where hospital providers are "dissatisfied with a final determination of the Secretary as to the amount of … payment under subsection … (d)." *Id.* § 1395oo(a)(1)(A)(ii). Subsection (d) establishes the IPPS system. Providers are not required to wait for a cost report settlement before appealing a final payment determination under subsection (d).

31.     HHS announces its IPPS final rate determinations in the Federal Register before the beginning of the federal fiscal year. Courts have uniformly held that these Federal Register publications constitute "final payment determinations of the Secretary" from which an immediate appeal to the Board may be taken under 42 U.S.C. § 1395oo(a)(1)(A)(ii). *Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 148 (D.C. Cir. 1986) (holding that any administrative action that provides "advance knowledge of the amount of payment [a provider] will receive" is a "final determination" of the Secretary.).

32.     Additionally, in 1980, Congress added another provision to the Medicare statute which allowed hospitals to seek Expedited Judicial Review ("EJR") in cases where the Board has jurisdiction under the statute to hear a hospital's appeal but lacks the authority to grant the hospital the relief it requested. Specifically, the Board is bound to follow all statutes, regulations, and agency policies. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842. When a hospital provider seeks to have one of those provisions set aside as unlawful, the Board, lacking the authority to grant the

requested relief, must grant EJR of the appeal so that the provider may immediately elevate the appeal to Federal court.

33.    And while the FY 1986 budget neutrality adjustments were determined nearly 40 years ago, plaintiffs nonetheless have the opportunity to challenge the legality of those adjustments because they have not been corrected and continue to reduce the FY 2026 IPPS rates.  *See St. Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018); *see also* 42 C.F.R. § 405.1885(a).

34.    Providers also "have the right to obtain judicial review of any final decision of the Board …." 42 U.S.C. § 1395oo(f)(1).  A Board dismissal decision is a "final decision" and subject to judicial review.  42 C.F.R. §§ 405.1877(a)(3)(i), 405.1875(a)(2)(ii); *see also Lee Mem'l Hosp. v. Becerra*, 10 F.4th 859, 864–65 (D.C. Cir. 2021) (noting that a Board dismissal of an appeal constitutes a final decision that may be reviewed by a Federal district court).

## PROCEDURAL BACKGROUND

35.    In accordance with 42 U.S.C. § 1395oo(a), the Plaintiff hospitals have challenged, and are dissatisfied with, HHS's failure to correct for the application of the budget neutrality adjustments in FY 2026.  The Plaintiff hospitals timely filed group appeals with the Board and have satisfied all other jurisdictional requirements for an appeal set forth at 42 U.S.C. § 1395oo(a)–(b).

36.    Plaintiff hospitals requested EJR because the Board does not have the power to grant the relief sought by the Providers.  The Providers requested EJR on February 20, 2026.  As the Plaintiff hospitals explained in their EJR request, because the Board is bound by the rates the Secretary published in the FY 2026 IPPS final rule and cannot declare them unlawful, it cannot grant the relief requested by the Providers.  The Board granted Plaintiffs' EJR request on March 17, 2026  (Exhibit 1).

16

37.     Because the Board's decision granting EJR is the "final decision[s] of the Board," 42 U.S.C. § 1395oo(f)(1), the Plaintiff hospitals now timely appeal to this Court.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**HHS is Acting in Excess of Its Statutory Authority**

38.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

39.     Agencies may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

40.     HHS is prohibited from applying the budget neutrality adjustments it calculated for FY 1985 under sections 1395ww(d)(3)(C)(i) and (e)(1)(B) in future years. As this Court in *St. Mary's* correctly stated, "[N]o part of the IPPS statute, including the budget neutrality provisions, authorized the Secretary to carry forward the 1985 budget neutrality adjustment to the following year; in fact, the statute forbade him from doing so." *St. Mary's*, 2024 WL 5186641, at *9.

41.     HHS ignored Congress's express command by applying a 0.954 adjustment to the standardized amount and a 1.05 percent reduction to the DRG weights into FY 1986 and the forty years that followed, including in the IPPS FY 2026 final rule at issue here.[2]

42.     As an initial matter, the text of section 1395ww(e)(1)(B) only permitted HHS to adjust the "standardized amount[]."  HHS's 1.05 percent reduction to the DRG weights was plainly not an adjustment to the standardized amount.  Thus, section 1395ww(e)(1)(B) did not authorize that adjustment in FY 1985, nor does it authorize it in FY 2026.

---

[2]  As explained above, the combined effect of these adjustments is that IPPS payments have been reduced by a factor of 0.9441 [0.954 x (1 ÷ 1.0105)].  To correct for this error, HHS would need to increase the FFY 2026 rates by 5.92 percent [1 ÷ 0.9441 = 1.0592].

43.    To the extent that section 1395ww(e)(1)(B) authorized HHS to adjust the "standardized amount[]" for budget neutrality in FYs 1984 and 1985, Subparagraph A unambiguously forecloses applying those adjustments after FY 1985.  That provision, which governs the calculation of the standardized amount for FY 1986 and later years, states in relevant part that "the Secretary shall compute an average standardized amount … equal to the respective average standardized amount computed for the previous fiscal year … under this [S]ubparagraph [A]" and adjusted only for inflation.  42 U.S.C. § 1395ww(d)(3)(A).  In FY 1986, the "amount computed for the previous fiscal year under this [S]ubparagraph [A]" was the FY 1985 standardized amount after it had been adjusted only by inflation for FY 1985.  That amount, however, did not include the FY 1985 adjustment for budget neutrality, because that adjustment was not "computed" pursuant to Subparagraph A, but rather in Subparagraph C.  By specifying that only the standardized amount computed pursuant to Subparagraph A could be carried forward into future years, Congress dictated that the budget neutrality adjustment made under section 1395ww(d)(3)(C)(i) cannot be applied beyond FY 1985.

44.    The text of section 1395ww(e)(1)(B) confirms this reading.  Any adjustment under that section must be made "under subsections [1395ww](d)(2)(F) and [1395ww](d)(3)(C)"—which are not in Subparagraph A and are therefore not part of the standardized amount that can advance into future years.  Furthermore, any adjustment under section 1395ww(e)(1)(B) can only be applied "[f]or discharges occurring in fiscal year 1984 or fiscal year 1985."  *See also id.* § 1395ww(d)(3)(C)(i) (authorizing HHS to make an adjustment under section 1395ww(e)(1)(B) "[f]or discharges occurring in fiscal year 1985 …").

45.    Since section 1395ww(e)(1)(B) only authorizes budget neutrality adjustments in 1984 and 1985, HHS's decision to apply those adjustments each year after 1985 was erroneous and

18

contrary to the statute.  HHS's interpretation of the statute is entitled to no deference and is not even reasonable, *see St. Mary's* 2024 WL 5186641, much less the best.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024) (holding that courts "determine the best reading of the statute" to resolve any "ambiguity.")

46.     For the reasons stated above, HHS's conduct was also *ultra vires*: "[n]o part of the … statute, including the budget neutrality provisions, authorized HHS to carry forward the 1985 budget neutrality adjustment to the following year; in fact, the statute forbade him from doing so." *St. Mary's*, 2024 WL 5186641, at *9.  As this Court found previously, HHS "patently violated this statutory provision" prohibiting the carrying forward the 1985 budget neutrality adjustment.

## COUNT II
### HHS Failed to Observe Procedure Required by Law

47.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

48.     HHS's decision not to correct for and remove the effect of the budget neutrality adjustments to the standardized amount for FY 2026 was unlawful because it "has failed to articulate a satisfactory explanation for [its] [in]action."  *Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1179 (D.C. Cir. 1994) (internal quotation marks omitted).

49.     HHS has already acknowledged that the statute does not authorize it to apply the FY 1985 budget neutrality adjustments beyond FY 1985.  *See* 56 Fed. Reg. at 43,418 ("We doubt anyone would seriously argue that this budget neutrality adjustment should have continued into subsequent years.").  Yet, that is exactly what HHS did.  HHS applied the budget neutrality adjustments starting in FY 1986 to the present, and HHS has yet to correct for that error despite repeated opportunities to do so, e.g., failing to address comments urging HHS to remove these adjustments in the FY 2026 IPPS rulemaking.

50.     Furthermore, CMS's responses to commentors in 1986 that urged CMS to remove the FY 1985 budget neutrality adjustments in subsequent years were themselves entirely conclusory and lacking in merit, *see* 50 Fed. Reg. at 35,697, indicating that CMS failed to consider an important aspect of the issue and "failed to articulate a satisfactory explanation for [its] [in]action." *Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d at 1179 (internal quotation marks omitted).

51.     The Supreme Court recently emphasized the particular importance of notice and comment rulemaking in the context of Medicare "where even minor changes to the agency's approach can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate." *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019).  Meanwhile, HHS's erroneous retention of the 1985 budget neutrality adjustment is hardly a "minor change[]." Rather, it substantially reduces the resources Congress intended hospitals to have to treat patients with the attendant negative affect on "millions of people."  While HHS has withheld these resources for the better part of forty years, HHS must at least correct its error going forward.  At a bare minimum, it was incumbent upon HHS to at least respond to the commenters that raised this important issue to address their concerns.

## COUNT III
### HHS's Actions Are Arbitrary and Capricious

52.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

53.     The APA deems an agency action unlawful when that agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

54.     As an initial matter, HHS provided no reasonable explanation justifying the retention of the 1985 budget neutrality adjustment into subsequent years.   Indeed, HHS

subsequently recognized that no serious person could justify such a policy: "We doubt anyone would seriously argue that this budget neutrality adjustment [i.e., the 1984 and 1985 budget neutrality adjustments] should have continued into subsequent years."  56 Fed. Reg. at 43418. HHS's determination to retain those budget neutrality adjustments into subsequent years constitutes arbitrary and capricious agency action.

55.      HHS's failure to correct for the application of the budget neutrality adjustments in FY 2026 rendering FY 2026 IPPS payments unlawfully understated is equally arbitrary, capricious and an abuse of discretion.  As Judge (now Justice) Kavanaugh explained in his concurring opinion in *Saint Francis*, "it would seem to be the very definition of arbitrary and capricious for HHS to knowingly use false facts when calculating hospital reimbursements."  *St. Francis Med. Ctr.*, 894 F.3d at 298 (Kavanaugh, J., concurring).

56.      The Board's decision dismissing the Plaintiff hospitals' appeals was also arbitrary and capricious because the Board disregarded black letter law that says (1) the budget neutrality adjustments were to sunset at the end of FY 1985 and (2) provisions precluding review must be interpreted narrowly.

57.      Moreover, the preclusion provisions at 42 U.S.C. § 1395ww(d)(7)(A) do not, and could not, preclude review of HHS's *ultra vires* actions.

## COUNT IV
### Mandamus

58.      The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

59.      Federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

21

60.     HHS has the non-discretionary duty to apply properly the substantive and procedural laws relating to Medicare payment, including to fully compensate the Plaintiff hospitals the amounts they are entitled to under the law.  HHS violated this non-discretionary duty by failing to remove the effect of the budget neutrality adjustments made to the standardized amount that governed hospital compensation for FY 2026.

61.     Thus, the Plaintiff hospitals request an order from this Court that HHS recalculate the Plaintiff hospital's IPPS payments for FY 2026 after correcting for and removing HHS's erroneous budget neutrality adjustments to the standardized amount.

## COUNT V
### All Writs Act

62.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

63.     HHS violated the Medicare Act and APA by failing to remove the effect of the budget neutrality adjustments made to the standardized amount in FY 1986 to the present, by unlawfully dismissing Plaintiff hospitals' appeals before the Board, and by reimbursing the Plaintiff hospitals an amount lower than the statutorily required amount from services provided in FY 2026.

64.     Under the All-Writs Act, federal district courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).

65.     By law, the Plaintiff hospitals are entitled to an order requiring HHS to make proper IPPS payments to the Plaintiff hospitals and to pay appropriate interest on the underpayments.  *See* 28 U.S.C. § 1651, 42 U.S.C. §§ 1395oo(f)(2), 1395g(d) and/or 1395*l*(j), and 42 C.F.R. § 405.378.

### REQUEST FOR RELIEF

66.     The Plaintiff hospitals request the following orders:

(a) Ordering HHS to recalculate the FY 2026 IPPS payment rates after correcting for and removing the effect of HHS's erroneous retention of budget neutrality adjustments that were explicitly limited to 1985 and applying that revised payment rate to Plaintiff hospitals' IPPS payments for FY 2026;

(b) Ordering HHS to pay appropriate interest on the underpayments;

(c) Enjoining HHS from applying the 1985 budget neutrality adjustments to any subsequent payment determinations;

(d) In the alternative, issuing a writ of mandamus ordering HHS to recalculate the Plaintiff hospital's IPPS payments for FY 2026 after correcting for and removing the effect of HHS's erroneous retention of budget neutrality adjustments that were explicitly limited to 1985 to the standardized amount;

(e) Award Plaintiff costs and attorney's fees as appropriate; and

(f) Providing such other relief as the Court may consider appropriate.

Date:  March 20, 2026                Respectfully submitted,

/s/ Mark D. Polston
Mark D. Polston, D.C. Bar No. 431233
Daniel J. Hettich, D.C. Bar No. 975262
Christopher P. Kenny, D.C. Bar No. 991303
Ahsin Azim, D.C. Bar No. 1671019
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 737-0500 (phone)
(202) 626-3737 (fax)
MPolston@kslaw.com

*Pro Hac Vice Forthcoming*

/s/ Alek Pivec
Alek Pivec, D.C. Bar No. 1046247
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20006
(202) 737-0500 (phone)
(202) 626-3737 (fax)
Apivec@kslaw.com

*Attorneys for Plaintiffs*